# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

LEONA E. LAGARES,                          :
                                           :
     Plaintiff,                      :
                                           :
     v.                              :       CIVIL ACTION FILE NO.
                                           :       1:13-CV-03505-AJB
CAROLYN W. COLVIN,                         :
*Acting Commissioner, Social*              :
*Security Administration*,                 :
                                           :
     Defendant.                      :

# O R D E R   A N D   O P I N I O N[1]

    Plaintiff Leona E. Lagares ("Plaintiff") brought this action pursuant to

section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to obtain judicial review

of the final decision of the Commissioner of the Social Security Administration

("the Commissioner") denying her application for Disability Insurance Benefits

("DIB") under the Social Security Act.[2]  For the reasons below, the undersigned

---

    [1]    The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure.  [*See* Dkt. Entries dated 11/14/13 & 11/20/13].  Therefore, this Order constitutes a final Order of the Court.

    [2]    Title II of the Social Security Act provides for federal DIB. 42 U.S.C. § 401 *et seq.*  Title XVI of the Social Security Act, 42 U.S.C. § 1381, *et seq.*, provides for Supplemental Security Income Benefits for the disabled ("SSI"). Title XVI claims are not tied to the attainment of a particular period of insurance

**REVERSES** the final decision of the Commissioner **AND REMANDS** the case to the Commissioner for further proceedings consistent with this opinion.

## I.     PROCEDURAL HISTORY

Plaintiff filed an application for DIB in April 2010, alleging disability commencing on October 15, 2008.  [Record (hereinafter "R") 93, 136].  Plaintiff's application was denied initially and on reconsideration.  [R82-83].  Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ").  [R106-07].  An evidentiary hearing was held on December 9, 2011.  [R48-81].  The ALJ issued a decision on April 2, 2012, denying Plaintiff's application on the ground that she had not been under a "disability" from the alleged onset date through the date of the

---

disability.  *Baxter v. Schweiker*, 538 F. Supp. 343, 350 (N.D. Ga. 1982).  Otherwise, the relevant law and regulations governing the determination of disability under a claim for DIB are nearly identical to those governing the determination under a claim for SSI. *Wind v. Barnhart*, 133 Fed. Appx. 684, 690 n.4 (11th Cir. June 2, 2005) (citing *McDaniel v. Bowen*, 800 F.2d 1026, 1031 n.4 (11th Cir. 1986)).   In general, the legal standards to be applied are the same regardless of whether a claimant seeks DIB, to establish a "period of disability," or to recover SSI, although different statutes and regulations apply to each type of claim. *See* 42 U.S.C. § 1383(c)(3) (establishing that the judicial provisions of 42 U.S.C. § 405(g) are fully applicable to claims for SSI). Therefore, to the extent that the Court cites to SSI cases, statutes, or regulations, they are equally applicable to Plaintiff's DIB claims.

2

decision. [R43-44]. Plaintiff sought review by the Appeals Council, and the Appeals Council denied Plaintiff's request for review on September 24, 2013.[3] [R7].

Plaintiff then filed action in this Court on October 23, 2013, seeking review of the Commissioner's decision. [*See* Doc. 1]. The answer and transcript were filed on April 17, 2014. [*See* Docs. 7, 8]. On May 19, 2014, Plaintiff filed a brief in support of her petition for review of the Commissioner's decision, [Doc. 11], and on July 21, 2014, the Commissioner filed a response in support of the decision, [Doc. 15].[4] The matter is now before the Court upon the administrative record, the parties' pleadings, and the parties' briefs, and it is accordingly ripe for review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).[5]

---

[3]     After receiving and reviewing additional argument, on January 16, 2014, the Appeals Council again denied Plaintiff's request for review. [R1-6]. It is undisputed that Plaintiff exhausted her administrative and judicial remedies and timely filed her civil action in this Court. [Doc. 15 at 2].

[4]     The briefing period was extended by consent of the parties and upon approval of the Court. [*See* Docs. 13, 14].

[5]     Plaintiff did not file a reply brief, (*see* Dkt.), and she waived oral argument, [Doc. 16].

3

## II.    STATEMENT OF FACTS[6]

### A.    *Background*

Plaintiff was born on March 26, 1956, [R146], and therefore was fifty-two years old at the time of her alleged disability onset date, [R146], fifty-five years old at the time of her administrative hearing, [R48], and fifty-six years old at the time of the ALJ's decision, [R44].  Plaintiff has a high-school education, [R57], and previously worked an assembler of electronics, [R53, 78].  She alleges that she became unable to work as of October 15, 2008, due to back, hand, leg, and foot pain; arthritis; patellar tendinitis; degenerative joint disease of the right knee; carpal tunnel syndrome; diabetes mellitus; and diabetic neuropathy.  [R52-53, 55, 59-62, 64-66, 74, 136, 150].  Plaintiff was insured through December 2013.  [R144].

### B.    *Plaintiff's Testimony*

In her testimony before the ALJ, Plaintiff complained of tingling and numbness in her hands that reduces her ability to grasp her tools, use buttons, and lift things like pots or pans full of water or food, but she stated that she is able to use zippers.  [R52, 55-56, 70-72].  She reported that she had carpal tunnel surgery in 2003 but the

---

[6]     In general, the records referenced in this section are limited to those deemed by the parties to be relevant to this appeal.  [*See* Docs. 11, 15].

symptoms returned.  [R51-52, 69-70].  She testified that the symptoms caused her to stop working in 2008 and that when she tried to go back in 2010, numbness and tingling kept her from performing satisfactorily.  [R54-57].  She stated that her hands numb and cramp after about five or ten minutes of repetitive activity, and she will then rub them together for about two to three minutes until the feeling comes back. [R72-73].

Plaintiff also stated that she had lower-back pain, leg pain, and popping, cracking, and pain in her knee.  [R60-62].  She indicated that her knees bother her every day and that her doctor treats them by prescribing medication.  [R61].  She reported that when she stands or sits for more than about thirty minutes, her lower back starts to hurt and her feet go to sleep, and that without medication, she did not believe that she could stand for even that long.  [R61-63].  Plaintiff also complained of neuropathy that causes numbness on both sides of her feet and in two toes, leg swelling that causes an inability to stand for long periods, and reliance on an unprescribed cane.  [R62, 66-67, 74, 76]. She stated that around the house, she hangs on to things for balance, and she tries to stay on her feet because when she walks around, the tingling and burning in her legs subsides.  [R67].

AO 72A
(Rev.8/8
2)

Plaintiff stated that she is in the house "all the time." [R68]. She testified that she sits down for an hour or two to watch television and then stands up again for about half an hour to dust and do dishes. [R68-69]. She reported that she cannot be stationary and needs to be walking. [R69]. Plaintiff also stated that approximately three days of every five are good days and that on the good days, she can go grocery shopping with her husband, do laundry, and dust. [R75-76]. She stated that on the bad days, she relies on her husband to do those things, and that approximately twice per week, she does not feel well and will lie down for as much as an hour. [R75-76].

C.    *Administrative Records*

In an undated disability report, Plaintiff stated that in or around September 2010, she began experiencing increased pain in her feet and increased tingling in her hands. [R173]. She reported that she had trouble bending to wash her feet, that her arms hurt when she washed her hair, and that she was having increased difficulty walking without help. [R175].

In a pain questionnaire dated December 9, 2010, Plaintiff complained of pain in her hands, legs, feet, and joints. [R183]. Plaintiff reported that the pain radiated into her shoulders, elbows, and legs, and that she had difficulty holding items in her hands.

6

[R183].  Plaintiff also indicated that she had problems sitting and standing for prolonged periods and walking long distances.  [R183].

In an undated disability report, Plaintiff indicated that in or around January 2011, her legs began tingling more, and her ability to concentrate decreased.  [R188].  She stated that her husband helps her bathe because she cannot lift her hands or arms over her head to wash her back, that her husband does the driving because her feet go numb when she drives, and that her husband prepares the meals because she cannot stand more than five minutes in one place.  [R190].  She also indicated that her husband cleans the house.  [R190].

### D.   Medical Records

On September 3, 2008, Plaintiff presented to John R. Schnell, M.D. for initial consultation.  [R204].  In his notes, Dr. Schnell indicates that Plaintiff reported right-knee pain starting on July 8, 2008, but that she denied any history of injury or trauma.  [R204].  The notes further indicate that Plaintiff reported moderate pain into the anterior aspect of the knee, especially when going up and down stairs, and that she could not squat due to pain.  [R204].  Physical examination revealed an antalgic gait,[7]

---

[7]     An antalgic gait is a limp adopted so as to avoid pain on weight-bearing structures, characterized by a very short stance phase.  The Free Online Medical Dictionary, Antalgic Gait, http://medical-dictionary.thefreedictionary.com/antalgic+gait

7

moderate tenderness over the patella and patellar tendon, moderate pain with extension

of the knee against resistance, but "no obvious signs of systemic illness, trauma,

atrophy, deformity, or infection"; non-tender calves, quadriceps, hamstrings, and

medial and lateral joint lines; stable ankle joints; no pain with hip range of motion; no

evidence of effusion in the right knee; normal circulation; normal sensation to light

touch; and intact motor function.  [R204].  It was noted that Plaintiff's medications

included Darvocet,[8] Zetia,[9] and Lantus.[10]  [204].  Dr. Schnell diagnosed moderate

---

(last visited 3/21/15).

[8]     Darvocet is the brand name of a combination product containing acetaminophen and propoxyphene.  Propoxyphene is an opioid pain reliever; after studies demonstrated that even at recommended doses, propoxyphene can cause significant toxicity to the heart, the U.S. Food and Drug Administration recommended that propoxyphene products be removed from the U.S. market.  MedlinePlus, Acetaminophen and Propoxyphene, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601008.html  (last visited 3/21/15).

[9]     Zetia (ezetimibe) is a cholesterol-reducing medication; it works by preventing the absorption or cholesterol in the intestine.  MedlinePlus, Ezetimibe, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603015.html  (last visited 3/21/15).

[10]     Lantus (insulin glargine) is a long-acting, man-made version of human insulin.  It works by replacing the insulin that is normally produced by the body and by helping move sugar from the blood into other body tissues where it is used for energy.  It also stops the liver from producing more sugar.  MedlinePlus, Insulin Glargine (rDNA origin) Injection, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a600027.html  (last visited

AO 72A
(Rev.8/8
2)

right-knee patellar tendinosis and degenerative joint disease, ordered x-rays to rule out degenerative arthritis, and recommended physical therapy. [R204-05]. X-rays of Plaintiff's right knee taken on September 8, 2008, revealed a moderate degree of osteoarthritis and a small joint effusion. [R200].

On November 3, 2008, Plaintiff presented to John R. Ehret, M.D. to establish care and receive treatment for sinus symptoms. [R220]. Dr. Ehret noted that Plaintiff's current medications included Zetia, Vasotec,[11] Lantus, Byetta,[12] and Amaryl.[13]

---

3/21/15).

[11]     Vasotec (enalapril) is used to treat high blood pressure. MedlinePlus, Enalapril, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a686022.html (last visited 3/21/15).

[12]     Byetta (exenatide injection) is used, along with diet and exercise and sometimes other medications such as insulin, to treat type II diabetes. It works by stimulating the pancreas to secrete insulin when blood sugar levels are high. MedlinePlus, Exenatide Injection, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a605034.html (last visited 3/21/15).

[13]     Amaryl (glimepiride) is used, along with diet and exercise and sometimes other medications such as insulin, to treat type II diabetes. It lowers blood sugar by causing the pancreas to produce insulin and helping the body use insulin efficiently. MedlinePlus, Glimepiride, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a696016.html (last visited 3/21/15).

AO 72A
(Rev.8/8
2)

On December 3, 2008, Plaintiff returned to Dr. Ehret for treatment of her diabetes. [R218].  Dr. Ehret assessed benign essential hypertension and type II diabetes mellitus, and he increased Plaintiff's Vasotec dosage.  [R219].

On January 8, 2009, Plaintiff presented to Dr. Ehret to discuss changes in her diabetes medication. [R216].  Plaintiff indicated that she could no longer afford Lantus. [R216].  Dr. Ehret assessed type II diabetes mellitus–uncomplicated, uncontrolled. [R216].  He stopped Plaintiff's use of Lantus, Byetta, and Amaryl, and started her on Humulin 70/30 insulin injections.[14]  [R217].

On July 16, 2009, Plaintiff again presented to Dr. Ehret for discussion of her medication.  [R215].  She was continued on Humulin 70/30 injections.  [R215].

On November 16, 2009, Plaintiff again presented to Dr. Ehret for follow-up on her diabetes and hypertension.   [R213].   Dr. Ehret assessed hypertension, hyperlipidemia, and type II diabetes mellitus.  [R214].

On April 22, 2010, Plaintiff again followed up with Dr. Ehret regarding her diabetes and hypertension.  [R210].  At that time she complained of "tingling of both

---

[14]      Humulin 70/30 is a pre-mixed injection comprised of intermediate- and short-acting types of human insulin.  U.S. Food & Drug Admin., Insulin, http://www.fda.gov/ForConsumers/ByAudience/ForWomen/WomensHealthTopics/ ucm216233.htm (last visited 3/21/15).

10

arms and both legs" but reported no numbness of the limbs.  [R210].  Both of Plaintiff's

feet appeared normal upon examination, and monofilament wire testing[15] of both feet

was also normal.  [R211].  Dr. Ehret assessed benign essential hypertension, type II

diabetes mellitus, and diabetic peripheral neuropathy.[16]  [R211].  Dr. Ehret started

Plaintiff on Neurontin[17] and increased her dosage of Vasotec.  [R211].

On July 26, 2010, Plaintiff presented to Melvin E. Glover, M.D., for a

consultative examination.  [R227].  Notes indicate that Plaintiff's chief complaints were

---

[15]      A doctor may assess protective sensation or feeling in the feet by touching them with a nylon monofilament.  People who cannot sense pressure from a monofilament have lost protective sensation and are at risk for developing foot sores that may not heal properly.  Nat'l Diabetes Information Clearinghouse (NDIC), Diabetic Neuropathies: The Nerve Damage of Diabetes, http://diabetes.niddk.nih.gov/dm/pubs/neuropathies (last visited 3/21/15).

[16]      Peripheral neuropathy is nerve damage in the arms and legs.  Symptoms may include numbness or insensitivity to pain or temperature; a tingling, burning, or prickling sensation; sharp pains or cramps; extreme sensitivity to touch; loss of balance, coordination and reflexes; and muscle weakness.  NDIC, *id.*

[17]      Neurontin (gabapentin) is often used to help control certain types of seizures in patients who have epilepsy.  Gabapentin is also used to relieve the pain of postherpetic neuralgia (the burning, stabbing pain or aches that may last for months or years after an attack of shingles) and restless legs syndrome.  *See* MedlinePlus, Gabapentin, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694007.html (last visited 3/21/15).

11

AO 72A
(Rev.8/8
2)

diabetes, carpal tunnel syndrome, bilateral foot paresthesias,[18] and back pain.  [R227].

Upon a review of systems, Plaintiff was noted to be positive for dyspnea[19] on exertion,

edema, nocturia,[20] claudication,[21] muscle pain, joint stiffness, numbness, and tingling.

[R227].  Upon examination, Dr. Glover found  some reduced range of motion of the

back and hips, mild weakness in the left upper and lower extremities, morbid obesity,

and "decreased sensation bilateral upper extremity [and] left lower extremity" with

"positive Tinnel's bilaterally,"[22] but found a normal gait and station; no muscle spasm,

---

[18]     Paresthesias are burning or prickling sensations that are usually felt in the hands, arms, legs, or feet, but can also occur in other parts of the body.  They are usually painless and described as tingling or numbness, skin crawling, or itching.  National Institute of Neurological Disorders and Stroke, Paresthesia, http://www.ninds.nih.gov/disorders/paresthesia/paresthesia.htm (last visited 3/21/15).

[19]     Dyspnea means difficulty in breathing or shortness of breath.  *See* The Free Online Medical Dictionary, *Dyspnea*, http://medical-dictionary.thefreedictionary.com/dyspnea (last visited 3/21/15).

[20]     Nocturia is the name for the condition in which a person wakes up several times during the night to urinate.  MedlinePlus, Urinating More at Night, http://www.nlm.nih.gov/medlineplus/ency/article/003141.htm (last visited 3/21/15).

[21]     Claudication refers to limping, usually intermittent limping.  *PDR Med. Dictionary* 350 (1st ed. 1995).

[22]     This note appears to refer to the Tinel test, a classic test for carpal tunnel syndrome.  In the Tinel test, the doctor taps on or presses on the median nerve in the patient's wrist.  The test is considered positive if the result is tingling in the fingers or a shock-like sensation.  Nat'l Inst. of Neurological Disorders & Stroke, Carpal Tunnel Syndrome Fact Sheet,

12

atrophy, tremors, tenderness, scarring, or swelling in Plaintiff's neck or back; no evidence of edema in the extremities; no tenderness, swelling, scarring, or gross deformities of the joints; normal fine and gross coordination in Plaintiff's upper extremities; and negative straight-leg raising; and he found that Plaintiff was able to ambulate without assistance and had no problems with activities of daily living. [R228, 231-33]. Dr. Glover diagnosed diabetes with peripheral neuropathy, hypertension, and morbid obesity, as well as carpal tunnel syndrome (per patient), and chronic back pain (per patient). [R229].

On August 26, 2010, Plaintiff presented to Dr. Ehret for follow-up on her diabetes and hypertension. [R238]. She complained of "tingling of the limbs" but did not report any numbness. [R238]. Dr. Ehret assessed benign essential hypertension; type II diabetes mellitus – uncomplicated, uncontrolled; and diabetic autonomic neuropathy.[23] [R239]. Dr. Ehret noted that Plaintiff could not tolerate Neurontin or

_____

http://www.ninds.nih.gov/disorders/carpal_tunnel/detail_carpal_tunnel.htm (last visited 3/21/15).

[23] Autonomic neuropathy affects the nerves that control the heart, stomach, intestines, bladder, sex organs, sweat glands, eyes, and lungs; regulate blood pressure; and control blood glucose levels. NDIC, *id.*

13

afford Lyrica,[24] and he had Plaintiff "[s]tart [E]lavil[25] for peripheral neuropathy." [R239].

Shakoora Omonuwa, M.D., reviewed the medical evidence of record on September 27, 2010.  [R241-48].  Dr. Omonuwa noted that Plaintiff's primary diagnoses were diabetic neuropathy, morbid obesity, and hypertension, and other alleged impairments included carpal tunnel syndrome and back problems.  [R241]. Based on his review of the record, Dr. Omonuwa opined that Plaintiff could lift and carry fifty pounds occasionally and twenty-five pounds frequently, sit six hours during an eight-hour workday, and stand and walk six hours during an eight-hour workday; that Plaintiff should never climb ladders, ropes, or scaffolds; and that she had no manipulative limitations.  [R242-44].  Dr. Omonuwa explained that although Plaintiff alleged pain in her hands and feet, carpal tunnel syndrome, and diabetes, Dr. Glover,

---

[24]      Lyrica (pregabalin) is used to relieve pain from damaged nerves caused by diabetes.  It works by decreasing the number of pain signals that are sent out by damaged nerves in the body.  MedlinePlus, Pregabalin, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a605045.html  (last  visited 3/21/15).

[25]      Elavil (amitriptyline) is a tricyclic antidepressant that is also used to relieve diabetic nerve pain.  MedlinePlus, Amitriptyline, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682388.html  (last  visited 3/21/15); NDIC, *id.*.

14

AO 72A
(Rev.8/8
2)

the consultative examiner, reported 5/5 grip pinch bilaterally, 4.5/5 grip strength in left upper and left lower extremities, 5/5 strength in the right upper and lower extremities, and normal gait without an assistive device.  [R248].  Dr. Omonuwa further remarked that Dr. Glover noted Plaintiff's body mass index to be 48.7 with reduced back and hip range of motion, and that while Plaintiff had neuropathy due to diabetes, she had no emergency-room or inpatient admissions for degenerative knee arthritis, renal failure, or myocardial infarction.  [R248].

On March 2, 2011, Plaintiff returned to Dr. Ehret for completion of disability paperwork.  [R250].  Plaintiff reported that she had previously worked assembling small electronics, but she could no longer grip tools without pain in her hands, wrists, and elbows; "her low back hurts with standing[;] and her hips hurt with walking short distances."  [R250].  In his "Physical Findings," Dr. Ehret noted low-back pain and tenderness; pain with range of motion in both shoulders; and reduced strength (4/5) in the right wrist, the fingers of both hands, and both lower extremities.  [R251].  Dr. Ehret also found that Plaintiff's balance and reflexes were normal, and he reported no musculoskeletal abnormalities in Plaintiff's wrists, elbows, hips, or knees. [R251].  Plaintiff had no decreased response to stimulation by vibration on the leg or foot. [R251].  Dr. Ehret assessed type II diabetes mellitus, diabetic peripheral neuropathy,

15

sacroiliitis,[26] low back pain, and carpal tunnel syndrome.  [R251-52].  Dr. Ehret further remarked that Plaintiff has "residual [deficits] in the hands due to her carpal tunnel syndrome," that "[s]he continues to have pain in her back, but we have been unable to diagnose a specific cause as the [patient] cannot af[f]ord imaging at this time," and that although he suspected spinal stenosis, it was difficult to make a prognosis without further diagnostic studies.  [R252].

On March 3, 2011, Dr. Ehret completed a Residual Functional Capacity ("RFC") Questionnaire.  [R254-55].  He indicated on the questionnaire that he had treated Plaintiff for two and a half years and that her diagnoses included type II diabetes mellitus, carpal tunnel syndrome, and low-back pain.  [R254].  He stated that her symptoms were "wrist, hand pain and weakness" and that the symptoms would "frequently" interfere with the level of attention and concentration required to perform simple work-related tasks.  [R254].  Dr. Ehret opined that Plaintiff can sit four hours during an eight-hour workday (30 minutes at a time); stand and walk four hours during an eight-hour workday (30 minutes at a time); walk 300 feet without rest or significant

---

[26]     Sacroiliitis is an inflammation of one or both of the joints where the lower spine and pelvis connect.  It can cause pain in the buttocks or lower back and may extend down one or both legs.  Mayo Clinic, Sacroiliitis, http://www.mayoclinic.org/diseases-conditions/sacroiliitis/basics/definition/CON-20028653?p=1 (last visited 3/21/15).

AO 72A
(Rev.8/8
2)

pain; frequently lift less than ten pounds; and occasionally lift up to twenty pounds; but that she is unable to use her right hand, fingers, and arm for gross and fine manipulation for more than ten to fifteen percent of an eight-hour workday or her left hand, fingers, and arm for gross and fine manipulation for more than twenty-five percent of an eight-hour workday. [R254-55]. Dr. Ehret indicated that Plaintiff needed a job that would permit shifting positions at will from sitting, standing, or walking, and that she would need unscheduled fifteen-minute breaks during an eight hour work day. [R254]. He estimated that Plaintiff would likely be absent from work three to four times per month as a result of her impairments and treatments. [R255].

### E.    Vocational Expert Testimony

The vocational expert ("VE") testified that Plaintiff had past relevant work as an assembler, which is semi-skilled light work. [R78]. She further testified that a person with a medium residual functional capacity who must avoid climbing ladders, ropes, and scaffolds and must avoid concentrated exposure to hazards such as machinery, heights, and similar circumstances, could perform Plaintiff's past work. [R78]. The VE also stated that a person of Plaintiff's age, education, and prior relevant work experience with the same non-exertional restrictions could work as a school-bus monitor (light work), a cafeteria attendant (light work), or a linen-room attendant

17

AO 72A
(Rev.8/8
2)

(medium work).  [R78-79].  The VE opined, however, that there were no jobs existing in the national or local economy for a person with only a light residual functional capacity, who could use her hands for grasping, turning, twisting objects with the right hand five to ten percent of the day, and the left hand twenty-five percent of the day; could use her fingers for fine manipulation five to ten percent of the day in the right and twenty-five percent of the day on the left; could use her arms for reaching five to ten percent of the day on the right and twenty-five percent on the left; and would tend to be absent from work more than three times a month.  [R79].

## III.   ALJ'S FINDINGS OF FACT

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

2.   The claimant has not engaged in substantial gainful activity since October 15, 2008, the alleged onset date (20 CFR 404.1571 *et seq*.).

. . .

3.   The claimant has the following severe impairments: degenerative joint disease of the right knee, osteoarthritis, status post carpal tunnel release, diabetes mellitus, peripheral neuropathy, and morbid obesity (20 CFR 404.1520(c)).

. . .

18

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

. . .

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except no climbing of ladders, ropes, and scaffolds; and avoid concentrated exposure to hazards such as machinery, heights, and similar circumstances.

. . .

6.  The claimant is capable of performing past relevant work as an assembler.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

. . .

7.  The claimant has not been under a disability, as defined in the Social Security Act, from October 15, 2008, through the date of this decision (20 CFR 404.1520(f)).

[Doc. 37-43].

The ALJ explained that he found Plaintiff's allegations of limitation to be less than fully credible because the treatment record in this case "reveals no specific restrictions recommended by any treating physicians"; there is no record evidence

19

indicating that a doctor recommended that Plaintiff use a cane for ambulation; "the record does not contain any opinions from treating or examining physicians that indicate that the claimant is disabled"; the record reflects normal physical examinations and no neurological testing by a specialist to substantiate the severity of the neuropathy Plaintiff alleges; there is no recommendation of knee-replacement surgery; and there is no evidence of physical therapy or pain-management treatment with narcotic pain medication or steroid injections.  [R41].  He also explained that he found Plaintiff's testimony to be contradictory regarding her ability to stand and walk for long periods because she testified that she suffers numbness and tingling in her feet and significant pain in her knees and back requiring the use of a cane, yet she also testified that she is on her feet for most of the day performing light household chores.  [R41].

The ALJ further explained that he credited the opinions of the non-examining state-agency consultants "to the extent that they indicate that the claimant is able to work"; that he gave "significant weight to the assessment and findings of Dr. Glover, as they are not inconsistent with the objective medical evidence"; and that he gave "reduced weight to the opinion of the treating source, Dr. Ehret" because his "statements are not accompanied with supporting nerve conduction studies, radiologic imaging, or other diagnostic techniques to substantiate such limitation in functioning"

20

and "his opinion of [Plaintiff's] physical abilities contained in the questionnaire are wholly inconsistent [with] his progress notes."  [R40, 42].

The ALJ also noted that he relied on the VE's testimony regarding the existence of jobs in the national economy for a person or Plaintiff's age, education, work experience, and RFC, and he found that even if Plaintiff were incapable of performing her past relevant work as an electronics assembler, a person with the residual functional capacity he assigned to her would also be capable of working as a school-bus monitor, cafeteria attendant, or linen-room attendant.  [R43].

## IV.    STANDARD FOR DETERMINING DISABILITY

An individual is considered disabled for purposes of disability benefits if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do previous work but cannot, considering age, education, and work experience, engage in

AO 72A
(Rev.8/8
2)

any other kind of substantial gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner. The claimant bears the primary burden of establishing the existence of a "disability" and therefore entitlement to disability benefits. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a). The Commissioner uses a five-step sequential process to determine whether the claimant has met the burden of proving disability. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). The claimant must prove at step one that he is not undertaking substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). At step two, the claimant must prove that he is suffering from a severe impairment or combination of impairments that significantly limits his ability to perform basic work-related activities. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). At step three, if the impairment meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing of Impairments), the claimant will be considered disabled without consideration of age, education, and work experience. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). At step four, if the claimant is unable to prove the existence of a

22

listed impairment, he must prove that his impairment prevents performance of past relevant work.  *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  At step five, the regulations direct the Commissioner to consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can perform other work besides past relevant work.  *See* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  The Commissioner must produce evidence that there is other work available in the national economy that the claimant has the capacity to perform.  *Doughty*, 245 F.3d at 1278 n.2.  To be considered disabled, the claimant must prove an inability to perform the jobs that the Commissioner lists.  *Id*.

If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  Despite the shifting of burdens at step five, the overall burden rests on the claimant to prove that he is unable to engage in any substantial gainful activity that exists in the national economy.  *Doughty*, 245 F.3d at 1278 n.2; *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983), *superceded by statute on other grounds by* 42 U.S.C. § 423(d)(5), *as recognized in Elam v. R.R. Ret. Bd.*, 921 F.2d 1210, 1214 (11th Cir. 1991).

## V.    SCOPE OF JUDICIAL REVIEW

A limited scope of judicial review applies to a denial of Social Security benefits by the Commissioner.  Judicial review of the administrative decision addresses three questions:  (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues.  *Washington v. Astrue*, 558 F. Supp. 2d 1287, 1296 (N.D. Ga. 2008); *Fields v. Harris*, 498 F. Supp. 478, 488 (N.D. Ga. 1980).  This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).  If substantial evidence supports the Commissioner's factual findings and the Commissioner applies the proper legal standards, the Commissioner's findings are conclusive.  *Lewis v. Callahan*, 125 F.3d1436, 1439-40 (11th Cir. 1997); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987) (per curiam); *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986)  (per curiam); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

"Substantial evidence" means "more than a scintilla, but less than a preponderance."  *Bloodsworth*, 703 F.2d at 1239.  It means such relevant evidence as

AO 72A
(Rev.8/8
2)

a reasonable mind might accept as adequate to support a conclusion and it must be enough to justify a refusal to direct a verdict were the case before a jury. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d at 1239.  "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam).  Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is substantially supportive evidence" of the ALJ's decision.  *Barron v. Sullivan*, 924 F.2d 227, 230 (11th Cir. 1991).  In contrast, review of the ALJ's application of legal principles is plenary.  *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

## VI.    CLAIMS OF ERROR

Plaintiff argues that the Commissioner's decision should be reversed because the ALJ erred by failing to accord adequate weight to Dr. Ehret's opinion or to show good cause for rejecting the opinion.  [Doc. 11 at 6].  She further contends that the decision should be reversed because the ALJ found severe impairments of degenerative joint disease of the right knee, osteoarthritis, status post carpal tunnel release, and peripheral

25

neuropathy but did not include any limitations related to those impairments in the hypothetical question he posed to the vocational expert.  [*Id*. at 11-12].

### A.    Dr. Ehret's Opinion

#### 1.    Legal Standards

The Commissioner evaluates every medical opinion that the Agency receives, regardless of the source.    20 C.F.R. §§ 404.1527(c), 416.927(c); *cf.* 20 C.F.R. §§ 404.1527(b), 404.927(b) ("In determining whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive."); Social Security Ruling ("SSR") 06-03p, 2006 WL 2329939 at *4 ("[T]he [Social Security] Act requires us to consider all of the available evidence in the individual's case record in every case.").   Thus, both examining and non-examining sources provide opinion evidence for the ALJ to consider in rendering a decision.   20 C.F.R. §§ 404.1527(c), (e), 416.927(c), (e). Although physicians' opinions about what a claimant can still do or the claimant's restrictions are relevant evidence, such opinions are not determinative because the ALJ has the responsibility of assessing the claimant's RFC.   20 C.F.R. §§ 404.1527(d)(2), 404.1546(c); SSR 96-5p, 1996 WL 374183 at *2; *Beegle v. Soc. Sec. Admin., Comm'r*, 482 Fed. Appx. 483, 488 (11th Cir. July 23, 2012) (per curiam); *Langley v. Astrue*,

26

777 F. Supp. 1250, 1252-61 (N.D. Ala. 2011).  In determining the weight of medical opinions, the ALJ must consider: (1) the examining relationship; (2) the treatment relationship; (3) evidence supporting the conclusions; (4) the consistency of the opinion with the record as a whole; (5) the medical expert's area of specialty; and (6) other factors, including the amount of understanding of disability programs and the familiarity of the medical source with information in the claimant's case record. 20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6).

A "treating physician" is the claimant's own physician, who has provided the claimant with medical treatment or evaluation and who has had an ongoing treatment relationship with the claimant.  *Nyberg v. Comm'r of Soc. Sec.*, 179 Fed. Appx. 589, 591 & n.3 (11th Cir. May 2, 2006) (per curiam) (citing 20 C.F.R. § 404.1502).  The opinion of a treating physician must be given substantial or considerable weight unless "good cause" is shown to the contrary.  *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004) (citing *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)); *accord Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178-79 (11th Cir. 2011).  Good cause exists when: (1) the treating physician's opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent

27

with the doctor's own medical records.  *Phillips*, 357 F.3d at 1241.  When electing to discount the opinion of a treating physician, the ALJ must clearly articulate his reasons; failure to do so is reversible error.  *Lewis*, 125 F.3d at 1440.

In general, a one-time examining (i.e., consulting) physician's opinion is not entitled to great weight.  *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1160 (11th Cir. 2004) (per curiam).  Also, in the Eleventh Circuit, "the report of a non-examining doctor is accorded little weight if it contradicts an examining doctor's report; such a report, standing alone, cannot constitute substantial evidence."  *Edwards v. Sullivan*, 937 F.2d 580, 584 (11th Cir. 1991); *accord Kemp v. Astrue*, 308 Fed. Appx. 423, 427 (11th Cir. Jan. 26, 2009) (per curiam). However, "the opinion of a non-examining physician who has reviewed medical records may be substantial evidence if it is consistent with the well-supported opinions of examining physicians or other medical evidence in the record."   *Hogan v. Astrue*, Civil Action No. 2:11cv237-CSC, 2012 WL 3155570, at *5 (M.D. Ala. Aug. 3, 2012) (affirming decision where ALJ properly discounted treating-physician opinion and instead relied on opinions of non-treating physicians that were consistent with the plaintiff's testimony and other medical evidence in the record).

AO 72A
(Rev.8/8
2)

2.      *Arguments*

Plaintiff contends that neither of the ALJ's stated reasons show good cause for discounting Dr. Ehret's opinion.  She contends that the ALJ misstated the facts in determining that Dr. Ehret's opinion was not supported by objective medical tests, as the record contains knee x-rays indicating moderate osteoarthritis, includes a positive test for Tinel's signs, and shows that doctors performed manipulative physical examinations revealing pain, weakness, decreased sensation, and reduced range of motion, [Doc. 11 at 3-4, 8-9 [citing R200, 204-05, 228, 230, 251]], and she also points to Dr. Ehret's note indicating that Plaintiff could not afford additional diagnostic imaging, [Doc. 11 at 4-5 [citing R252]]. Plaintiff further avers that the ALJ's explanation that Dr. Ehret's "opinion of [Plaintiff's] physical abilities contained in the questionnaire are wholly inconsistent [with] his progress notes," [R42], is both conclusory, [Doc. 11 at 10], and in conflict with medical notes showing that Plaintiff consistently complained of tingling in her arms and legs, [Doc. 11 at 8 [citing R210, 238]], that Dr. Ehret repeatedly diagnosed diabetic neuropathy and prescribed nerve-pain medication, [Doc. 11 at 8 [citing R211, 239]], and that Dr. Glover's examination revealed positive Tinel's signs, weakness, and loss of

sensation in the extremities, and reduced range of motion in the back and hips, [Doc. 11 at 9 [citing 228-30, 251-52, 229]].

In response, the Commissioner acknowledges that the record does, in fact, contain the abnormal knee x-ray and examination notes indicating positive Tinel's signs, limitations in range of motion, and weakness and loss of sensation in the extremities.  [Doc. 15 at 13, 15 [citing R200, 228, 232, 248, 251]].  Unable to point to discussion in the ALJ's decision of the abnormal knee x-ray, the positive test for Tinel's signs, or Plaintiff's inability to pay for additional diagnostic testing, the Commissioner instead appears to suggest that the impairments revealed through the use of the objective diagnostic techniques that were applied were insufficiently severe to support the limitations stated in Dr. Ehret's opinion.  [*See* Doc. 15 at 12-13 (arguing that other than "mild weakness in the left upper and lower extremities, . . . some reduced range of motion of the back and hips, . . . some mild decreased sensation in the left upper and left lower extremities, and a positive Tinel's sign," Dr. Glover's findings were "essentially normal"); 15 (pointing out that the x-ray "revealed anatomic alignment" and "relatively preserved" joint spaces)].  The Commissioner also points to evidence and issues in the medical record that could be construed to cut against Dr. Ehret's opinion, such as Dr. Ehret's examination records indicating normal pulse,

30

appearance, and sensation in Plaintiff's feet; lack of emergency-room or in-patient treatment; gaps in treatment; certain medical visits where there is no note of Plaintiff complaining of pain; lack of a physical-therapy or pain-management record; a medical note indicating that Plaintiff's balance was normal and that she had no musculoskeletal abnormalities in her wrists or elbows; lack of treatment notes documenting muscle spasm, atrophy, motor deficits, sensory deficits, or reflex deficits, or imposing limitations on Plaintiff's activities; few records of muscle weakness; lack of a history of injury or trauma; Dr. Glover's notes showing that examination of Plaintiff's back and neck revealed no muscle spasm, atrophy, tremors, tenderness, scarring or swelling, that Plaintiff's extremities showed no signs of tenderness, swelling, scarring, or deformity, that Plaintiff had a normal gait, negative straight-leg raising, and could ambulate without assistance, and that Plaintiff had normal fine and gross coordination in her upper extremities; and lack of an opinion of disability prior to March 2011. [Doc. 15 at 9-15, 20].   The Commissioner also argues that Dr. Ehret's functional-capacity questionnaire was inconsistent with the opinion provided by the state-agency medical consultant, who further noted that Plaintiff showed no signs of renal failure or myocardial infarction.  [Doc. 15 at 15-17].

31

AO 72A
(Rev.8/8
2)

After careful consideration of the ALJ's opinion and the medical evidence of record, the Court is unable to conclude that the ALJ provided good cause for his decision to assign reduced weight to Dr. Ehret's opinion.  First, it is simply not true that Dr. Ehret's opinion of Plaintiff's physical abilities were "wholly inconsistent" with his progress notes.  [R42].  In April 2010, Plaintiff complained to Dr. Ehret of "tingling of both arms and both legs," Dr. Ehret assessed diabetic peripheral neuropathy, and he started Plaintiff on medication for nerve pain.  [R210-11].  In August 2010, Plaintiff again complained to Dr. Ehret about "tingling of the limbs," Dr. Ehret assessed diabetic autonomic neuropathy, and, noting that Plaintiff could not tolerate Neurontin or afford Lyrica, Dr. Ehret had Plaintiff start Elavil for peripheral neuropathy.  [R238-39].  These notes certainly do not indicate that Plaintiff's extremities were fully functional or that her symptoms were improving.  Thus, the Court finds no basis for the ALJ's explanation that Dr. Ehret's opinion lacked merit because it was "wholly inconsistent" with his treatment notes.[27]

---

[27]   It also bears noting that while the ALJ appears to discount Plaintiff's last visit to Dr. Ehret as simply an appointment to complete disability paperwork rather than to receive treatment, medical notes from that visit indicate progressing symptoms consistent with Dr. Ehret's opinion, including low-back pain and tenderness; pain with range of motion in both shoulders; and reduced strength (4/5) in the right wrist, the fingers of both hands, and both lower extremities, resulting in diagnoses of diabetic neuropathy, sacroiliitis, low back pain, carpal tunnel syndrome, and suspected spinal

AO 72A
(Rev.8/8
2)

Second, the ALJ appears to have erred similarly in explaining that he discounted Dr. Ehret's opinion because it was "not accompanied with supporting nerve conduction studies, radiologic imaging, or other diagnostic techniques to substantiate such limitation in functioning." [R40]. The record in fact shows that in September 2008, Plaintiff had x-rays taken, which indicated tri-compartmental osteoarthritis, with marginal osteophytes, worse at the patellofemoral joint, and a small joint effusion, and physical examination indicated moderate tenderness over Plaintiff's patella and moderate pain with extension of the knee against resistance, [R200, 204-05]; in July 2010, she underwent testing that revealed a positive Tinel's sign bilaterally, and physical examination revealed decreased sensation in Plaintiff's upper extremities and her left lower extremity as well as reduced range of motion in her back, [R228, 230]; and in March 2011, physical examination revealed low-back pain and tenderness on palpation, bilateral shoulder pain, and bilateral upper and lower-extremity weakness,

---

stenosis. [R251-52]. Dr. Ehret's opinion is also consistent with the September 2008 knee x-ray indicating moderate osteoarthritis, [R200], and Dr. Glover's July 2010 notes that a review of systems indicated that Plaintiff was positive for dyspnea on exertion, edema, claudication, muscle pain, joint stiffness, numbness, and tingling; and that examination revealed a reduced range of motion of the back and hips, mild weakness in the left upper and lower extremities, morbid obesity, and "decreased sensation bilateral upper extremity [and] left lower extremity" with "positive Tinnel's bilaterally." [R227-28, 231-33].

33

[R251].  There is no mention of the x-rays or the Tinel's signs in the ALJ's opinion.[28]
[*See* R35-44].  Thus, it appears that the ALJ failed to recognize the extent of the
objective diagnostic evidence appearing in the record.

It is also troubling that the ALJ discounted Dr. Ehret's opinion because it lacked
"supporting nerve conduction studies, radiologic imaging, or other diagnostic
techniques," yet he failed to acknowledge Dr. Ehret's notes indicating that Plaintiff had
difficulty paying for treatment and specifically that she was unable to afford additional
diagnostic imaging.  [*See* R40, 216, 239, 252].  It is well established that an ALJ must
consider evidence showing that claimant is unable to afford medical care before
discounting his credibility based upon failure to pursue or comply with treatment.
*See, e.g.*, SSR 96-7p, 1996 WL 374186 at *6-7 (providing that the lack of supporting
diagnostic testing is one factor to consider among many and that the adjudicator must
consider information in the case record that may explain gaps in the medical record);
*Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003) (recognizing prior holdings
that poverty may excuse noncompliance); *Beegle*, 482 Fed. Appx. at 487 ("[T]he ALJ
may not draw any inferences about an individual's symptoms and their functional

---

[28]      It is also notable that the reviewing physician's opinion makes no mention
of the knee x-ray or the positive Tinel's signs, which suggests to the Court that his
opinion is also based on a materially incomplete review of the record.  [*See* R248].

34

effects from a failure to seek or pursue medical treatment without first considering any explanations that might explain the failure to seek or pursue treatment."). It would be illogical to presume that a treating physician's credibility may be discounted based on a dearth of diagnostic testing without a similar consideration of the claimant's ability to afford the tests.

Third, while the Commissioner's point that the record could have supported a determination that Plaintiff's demonstrated symptoms were too mild to support Dr. Ehret's opinion is certainly well-taken, it is notable that the ALJ's decision does not clearly articulate any perceived conflicts between any of the components of Dr. Ehret's opinion and any particular portion of the record evidence. Instead, the ALJ simply concluded that Dr. Ehret's opinion was unsupported by "diagnostic techniques to substantiate such limitation in functioning" and "wholly inconsistent" with his progress notes—assertions that are, as discussed above, belied by the record. [*See* R40, 42]. The Court may not affirm an ALJ's decision based on a post-hoc rationalization. *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168-69 (1962) ("The courts may not accept appellate counsel's post hoc rationalizations for agency action; [*SEC v.*] *Chenery* [*Corp.*, 318 U.S. 63, 87-88 (1943),] requires that an agency's discretionary order be upheld, if at all, on the same basis articulated in the order by the agency itself

35

. . . ."); *Owens v. Heckler*, 748 F.2d 1511, 1516 (11ᵗʰ Cir. 1984) ("We decline . . . to affirm simply because some rationale might have supported the ALJ's conclusion. Such an approach would not advance the ends of reasoned decision making.").

3.   *Effect of the ALJ's Failure to Provide Good Cause for Discounting the Treating-Physician Opinion*

Plaintiff cites case law standing for the proposition that where the Commissioner ignores or fails to properly refute the treating physician's opinion, it will be accepted as true as a matter of law.  [*See* Doc. 11 at 7, 10 (citing *Snyder v. Comm'r of Soc. Sec.*, 330 Fed. Appx. 843, 847, 849 (11ᵗʰ Cir. May 29, 2009) (per curiam); *Lewis*, 125 F.3d at 1441; *MacGregor v. Bowen*, 786 F.2d 1050, 1053-54 (11ᵗʰ Cir. 1986))]. The Commissioner does not provide a contrary legal argument but instead contends that because Dr. Ehret treated Plaintiff only seven times from late 2008 through 2010 and saw her for the first time in seven months in March 2011 when she visited for the purpose of having him complete the disability form, he did not have the longitudinal perspective normally associated with treating physicians.  [Doc. 15 at 9-10 (citing 20 C.F.R. § 404.1527(c)(1), (c)(2) (weight accorded a doctor's opinion depends on the doctor's examining and treating relationship with the claimant))].

36

The Court finds little persuasive value in the Commissioner's response, as the ALJ's decision expressly refers to Dr. Ehret as "the treating source."[29]   [*See* R42]. Additionally, in a relatively recent opinion, the Eleventh Circuit acknowledged that there is case law supporting Plaintiff's position that "if an ALJ fails clearly to articulate reasons for discounting the opinion of a treating physician, that evidence must be accepted as true as a matter of law."   *See Lawton v. Comm'r of Soc. Sec.*, 431 Fed. Appx. 830, 835 (11th Cir. June 22, 2011) (citing *MacGregor*, *id.*).  However, in that same opinion, the Eleventh Circuit then rejected this accept-as-true sanction because it was bound by its "earlier decisions[, which] had remanded cases to the agency when there was a failure to provide an adequate credibility determination." *Id.* (citing *Owens*, 748 F.2d at 1516; *Wiggins v. Schweiker*, 679 F.2d 1387, 1390 (11th Cir. 1982)).  Plaintiff proffers no cases post-dating *Lawton* in which a court in the Eleventh Circuit has applied the accept-as-true sanction, and the Court's research has

---

[29]     The Court recognizes that the ALJ also stated that the "record does not contain any opinions from treating or examining physicians that indicate that the claimant is disabled," [R41], which, given the VE's testimony indicating that a hypothetical person of Plaintiff's age, education, and prior relevant work, and who was restricted as described in Dr. Ehret's opinion, would be precluded from all work, [R78-79], appears to be in conflict with the ALJ's identification of Dr. Ehret as a treating source, [R42].  Be that as it may, the Court sees this conflict not as a basis for concluding that the ALJ did not, in fact, find Dr. Ehret to be a treating source, but rather as an additional point in need of further explanation.

revealed none.  As a result, the Court concludes that remand is the appropriate remedy so that the Commissioner may reconsider and more fully explain the weight to be given the medical opinions and his reasons for doing so.

### B.      Completeness of the Hypothetical Question

Plaintiff's second allegation of error—that the ALJ found severe impairments that he then failed to accommodate in the RFC—is closely bound to the ALJ's failure to clearly explain the weight accorded the physicians' opinions.  It is generally true that the mere existence of an abnormality or diagnosis alone does not establish the degree to which the claimant is limited in her ability to work or necessarily undermine an ALJ's RFC determination.  *See Moore v. Barnhart*, 405 F.3d 1208, 1213 n.6 (11th Cir. 2005) (per curiam) (noting that the existence of an impairment does not reveal the extent to which it limits the claimant's ability to work).  By definition, however, a "severe" impairment is one that has more than "a minimal effect" on the claimant's ability to work.  *See Hillsman*, 804 F.2d at 1181 (defining a non-severe impairment as "merely a slight abnormality which has a minimal effect on the general ability to work"); *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984) (per curiam) (defining a non-severe impairment as "a slight abnormality which has such a minimal effect on the

AO 72A
(Rev.8/8
2)

individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience").

Here, because the ALJ neglected to clearly explain the reasons for discounting Dr. Ehret's opinion regarding Plaintiff's limitations, is it also unclear how the ALJ reached the determination that Plaintiff has the severe impairments of degenerative joint disease of the right knee, osteoarthritis, status post carpal tunnel release, diabetes mellitus, peripheral neuropathy, and morbid obesity, yet is, aside from the need to avoid hazards, able to perform a full range of medium work.  [R37-38].  As Plaintiff points out, it appears contradictory for the ALJ to find that the impairments have more than a minimal effect on Plaintiff's ability to work but cause no further limitations in her ability to stand, walk, balance, stoop, kneel, crouch, crawl, and use her hands.  [*See* Doc. 11 at 13].  Consequently, the ALJ must also ensure that he closes this gap in the decision's reasoning when upon remand he reconsiders and explains with particularity the weight given the opinions of Plaintiff's limitations and the reasons therefore.

AO 72A
(Rev.8/8
2)

## VII.   CONCLUSION

For the reasons above, the Court **REVERSES** the final decision of the Commissioner and **REMANDS** the case for further proceedings consistent with this opinion.  The Clerk is **DIRECTED** to enter final judgment in Plaintiff's favor.

**IT IS SO ORDERED and DIRECTED,** this the 23rd day of March, 2015.

ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

40